IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ODETTA A. TODD,                                     :
                              Plaintiff              :
        v.                                          :        3:CV-04-2637
                                                    :        (JUDGE VANASKIE)
LUZERNE COUNTY CHILDREN AND        :
YOUTH SERVICES, EUGENE N. CAPRIO,  :
                              Defendants            :

MEMORANDUM

Plaintiff Odetta A. Todd has brought this action against Defendants Luzerne County

Children and Youth Services and its Executive Director, Eugene N. Caprio, alleging violations

of due process and equal protection under the Pennsylvania and United States Constitutions.[1]

Ms. Todd's claims are set forth in the context of her unsuccessful quest to obtain kinship foster

care parent status for the care of her sister's four (4) children.  Kinship foster care status would

have entitled Plaintiff to monthly payments for each of her sister's children.

Presently before the Court is Defendants' Motion for Summary Judgment.  (Dkt. Entry

41.)  As explained below, the Court will grant Defendants' Motion for Summary Judgment with

respect to Plaintiff's substantive due process and equal protection claims because Plaintiff

cannot establish that foster care payments fall within the narrow class of interests protected by

the substantive component of the due process clause, and she has not shown that she was

---

[1]This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 28
U.S.C. § 1367.

treated differently than other similarly situated persons.  Defendants' Motion for Summary

Judgment will be denied with respect to Plaintiff's procedural due process claim because a

genuine issue of material fact exists as to whether Plaintiff abandoned her application, thereby

obviating consideration of the procedures made available to her, or had her application denied

without being offered the opportunity to appeal, as required by applicable regulations.

I.  BACKGROUND

Luzerne County Children and Youth Services ("C & Y Services") is a state-mandated

agency with a goal "to ensure for each child in this Commonwealth a permanent, legally

assured family which protects the child from abuse and neglect."  55 PA. CODE § 3130.11.  C &

Y Services is "designed to keep children in their homes; prevent abuse, neglect and

exploitation; and help overcome problems that result in dependency and delinquency."  55 PA.

CODE § 3130.12.

Kinship Foster Care is a program administered by C & Y Services that places dependent

children with approved relatives, friends, or neighbors.  (Eugene Caprio Dep., Dkt. Entry 44-2,

at 12.)[2]  As explained in an "Information Sheet" on Welfare Reform and Kinship Care:

> Kinship Care is the full time care of a child who is separated from his or her
> parents and placed in a home of a caregiver who may be a relative or a family
> friend or neighbor.  Kinship Care can be formal or informal.

---

[2] For the convenience of the reader, hyperlinks to the Court's Electronic Case File
("ECF") record have been made.  The citation form lists the page of the ECF record where the
information linked to the citation may be found.

> Formal Kinship Care exists when a child welfare agency has legal custody of a child and provides supervision to the caregiver and services to the child. The child is not usually eligible for cash assistance through the County Assistance Office (CAO), since the caregiver receives foster care payments for the child.
>
> Informal Kinship Care arrangements are made by parent(s), or a child welfare agency with the parent's consent, for an adult relative, friend, neighbor or someone else known to the family to care for the child. Legal custody has not been transferred to the child welfare agency, and no foster care payments are made. Also legal custody dos not have to be transferred to the caregiver. Social services may be available through the child welfare agency, if the caregiver desires them. The caregiver and/or the child may be eligible for cash assistance and other benefits through CAO.

(Dkt Entry 47-7 at 47.)

At issue in this case is Formal Kinship Care and the payments attendant to that classification. Odetta Todd's sister, Tamu Todd, suffered from a substance abuse problem, which caused C & Y Services to intervene in the case of Tamu's children. (Eugene Caprio Dep., at 17.) Between 1998 and 2001, Ms. Todd received custody of Tesha Todd, Dione Todd, Vincent Todd and Amande Lee Barberio. (Defs.' Statement of Material Facts ("SMF"), Dkt. Entry 42, ¶¶ 4-6.) The process by which Ms. Todd acquired her sister's children and sought financial assistance is described below.

On December 18, 1998, in a dependency action before the Court of Common Pleas of Luzerne County, Juvenile Division, Judge Chester Muroski transferred physical and legal

custody of Tesha Todd to Plaintiff.[3]  (Pl.'s Ex. 1, Dkt. Entry 47-2, ¶ 2.)  Ms. Todd was directed to cooperate with C & Y Services and to follow all recommendations of the agency.  (Id. at ¶ 5.)  Several months later, on May 26, 1999, Ms. Todd and C & Y Services held a meeting to discuss the Todd Family Service Plan.[4]  (Odetta Todd Aff., Dkt. Entry 47, ¶ 15; Pl.'s Ex. 3, Dkt. Entry 47-2, 7-12.)  During the course of the meeting, Ms. Todd made it clear that she was experiencing financial difficulties in caring for her sister's children.  While at the meeting, Ms. Todd inquired about becoming a foster parent so as to qualify for foster care payments, and C & Y Services allegedly told her she did not qualify to be a foster parent because she was related to the children.  (Odetta Todd Aff., at ¶ 15.)

As a follow up to the meeting, C & Y Services requested a review conference before the court to consider the appropriateness of discontinuing the dependency action.  (Pl.'s Ex. 4, Dkt. Entry 47-2, at 13.)   According to Plaintiff, at this review conference, held on July 12, 1999, Luzerne County Orphans Court Juvenile Court Master Cynthia Muroski, now deceased, recommended Ms. Todd as a candidate for Kinship Foster Care.  (Odetta Todd Aff., at ¶ 20; Pl.'s Ex. 5, Dkt. Entry 47-2, at 15-16.)

Several months passed without any action upon this alleged recommendation.  On

---

[3]Judge Muroski considered the fact that Dione Todd was already living with Ms. Todd, and he preferred to keep the siblings together.  (Odetta Todd Aff., at ¶ 14.)

[4]55 PA. CODE § 3130.61(a) provides: "The county agency shall prepare, within 60 days of accepting a family for service, a written family service plan for each family receiving services through the county agency."  55 PA. CODE § 3130.61(a).

October 18, 1999, Ms. Todd requested another review conference before the court.  She

referenced C & Y Services' lack of assistance in connection with kinship foster care as the

reason for petitioning the court.  (Pl.'s Ex. 6, Dkt. Entry 47-2, 18-19.)

On November 4, 1999, Marijo Sullivan, Foster Care Supervisor at C & Y Services, called

Ms. Todd to arrange an appointment for the following day.[5]  (Odetta Todd Aff., at ¶ 24.)   At the

appointment, Ms. Todd discussed the Foster Parent Program process with Ms. Sullivan and

received three forms: a Pennsylvania State Police Request For Criminal Record Check,

Pennsylvania Child Abuse History Clearance Form, and Foster Family Health Appraisal.  (Pl.'s

Exs. 14-16, Dkt. Entry 47-3, at 30-34.)  Ms. Todd completed the three forms and mailed the

Criminal Record Check Form and Child Abuse Forms to the Pennsylvania State Police Central

Repository.  (Odetta Todd Aff., at ¶¶ 42-43; Pl.'s Exs. 14 & 15, Dkt. Entry 47-3, at 29-32.)  As

Ms. Todd received the forms back from the State Police Central Repository, she returned them

to Ms. Sullivan.  (Id. at ¶ 44.)

On November 15, 1999, after another meeting with C & Y Services, Ms. Todd submitted

a completed Foster Care Application.[6]  (Pl.'s Ex. 11, Dkt. Entry 47-3, at 5-19.)  In this

application, Ms. Todd disclosed her prior convictions for food stamp fraud and disorderly

conduct/simple assault.  (Id. at 15.)

---

[5]Marijo Sullivan is also referred to as Marijo Quigley.

[6]Notably, the application does not have a specific category for Kinship Foster Care, or
require any additional information for those applying for Kinship Foster Care.

As a result of the completion of the Foster Care Application, the review conference scheduled for November 17, 1999, was cancelled. (Odetta Todd Aff., at ¶¶ 29-30.)  Soon thereafter, on November 22, 1999, Ms. Todd wrote a letter to County Commissioner Thomas Makowski and Gene Caprio, Executive Director of C & Y Services, expressing her frustration with C & Y Services over the kinship foster care matter.  (Odetta Todd Aff., at ¶ 33; Pl.'s Ex. 8, Dkt. Entry 47-2, at 24-26; Pl.'s Ex. 9, Dkt. Entry 47-3, 1-3.)  In her letter, Ms. Todd complained of C & Y Services' misrepresentation as to her eligibility for Kinship Foster Care.  (Id.)  "I felt like Children & Youth would have rather shut and closed my case rather than helping me find ways to help financially provide for the children," she wrote.  (Pl.'s Ex. 9, at 1.)  On November 23, 1999, the following day, Mr. Makowski responded that he would be in touch shortly.  (Pl.'s Ex. 10, Dkt. Entry 47-3, at 4.)

C & Y Services accepted Ms. Todd's application for the foster care of Dione Todd and Tesha Todd on December 2, 1999.  (Odetta Todd Aff., at ¶ 36.)  In order to complete the application process, C & Y Services required Ms. Todd to participate in foster parent training sessions.  (Id. at ¶ 38.)  Ms. Todd was unable to attend at that time because of her enrollment in an eight week family session with her son Lance through the Family Service Association of Wyoming Valley.  (Id. at ¶ 39.)

Meanwhile, on November 30, 1999, Tamu Todd gave birth to her third child, Vincent Todd, which caused the filing of another dependency petition by C & Y Services due to drug

exposure.  (Pl.'s Ex. 12, Dkt. Entry 47-3, 20-26.)  On December 3, 1999, Judge Muroski

ordered that physical and legal custody of Vincent Todd be transferred to Ms. Todd.  (Pl.'s Ex.

13, Dkt. Entry 47-3, at 27-28.)

On January 21, 2000, Ms. Sullivan wrote a letter to Ms. Todd updating her on the status

of the application.  (Pl.'s Ex. 17, Dkt. Entry 47-3, at 35-38.)  In her letter, Mrs. Sullivan told Ms.

Todd that she had contacted the Department of Public Welfare, the Adult Probation Office, and

the Court Advocate Program in connection with Ms. Todd's application.  In order to complete

the application file, Ms. Sullivan requested Ms. Todd to sign release forms authorizing these

offices to "share any and all information concerning [Ms. Todd's] family, either orally or in

writing, with [C&Y Services]." (Id.; Sullivan Ex. 5, Dkt. Entry 44-3, at 38-41.)  All three release

forms accompanied the letter.  Ms. Sullivan wrote that "[t]o complete your file, I need to have

these records . . . ."  She also reminded Ms. Todd of her obligation to complete the foster

parent training.  (Id.)

Upon realizing that Ms. Sullivan had contacted these agencies without her consent, Ms.

Todd came to the conclusion that Mrs. Sullivan had discussed her case in detail with Adult

Probation, or she could not have known that Ms. Todd participated in the Court Advocate

Program.  (Odetta Todd Aff., at ¶¶ 47-48.)  Ms. Todd admitted during her deposition that she

did not sign the release forms because she believed that Ms. Sullivan had contacted her

probation officer and Court Advocate without receiving proper authorization to do so.  (Todd

7

Dep. at 20-21.)  Ms. Todd also testified that Ms. Sullivan "did let me know that without signing these releases, I would not be able [to] go forward with the process."  (Id. at 26)

C & Y Services case worker Cheryl Klimek testified that she had several phone conversations with Ms. Todd with regard to the necessity to sign the release forms.[7]  (Cheryl Klimek Dep., Dkt. Entry 44-5, at 18.)  Mr. Caprio also testified that Ms. Todd refused to sign the release forms.  (Eugene Caprio Dep., at 30.)

Despite Ms. Todd's failure to sign the releases, C & Y Services continued working on Ms. Todd's application for kinship foster care.  By letter dated February 25, 2000, C & Y Services notified Ms. Todd of scheduled foster care training sessions for foster parent applicants.  (Dkt. Entry 44-3 at 48.)  C & Y Services monitored Ms. Todd's participation in the foster care training sessions.  In a handwritten note dated March 31, 2000, Cheryl Klimek told Ms. Todd that she wanted to meet with Ms. Todd "to process your foster parent application."  (Dkt. Entry 47-6 at 1.)  On April 7, 2000, Cheryl Klimek came to Ms. Todd's home to perform a home study.  Ms. Klimek testified that Ms. Todd was short bedding and beds, causing her to fail the home study, a fact disputed by Ms. Todd.  (Cheryl Klimek Dep., at 12.)

---

[7]Ms. Todd denies that Ms. Klimek told her that the application would not be processed without the executed releases.  Ms. Todd also testified, however, that after Ms. Sullivan and Jackie Stapleton told her that "until I signed the releases, I would not be able to go forward," she "gave a signed release."  (Todd Dep. at 29.)  It is not clear what release Ms. Todd is referencing by this testimony.  What is clear, however, is that she never signed the forms accompanying Ms. Sullivan's January, 21, 2000 letter.

On June 13, 2000, Attorney Vincent Johnson wrote to C & Y Services on behalf of Ms.

Todd to ascertain the status of the November 15, 1999 foster care application.  Attorney

Johnson stated that "[i]f there are any problems with Ms. Todd's application that I may assist

you with, please do not hesitate to call my office."  (Dkt. Entry 47-6 at 6.)  On July 25, 2000, Ms.

Todd wrote a letter to Mr. Makowski informing him that she would present her story to the

media if no action were taken.  (Pl.'s Ex. 24, Dkt. Entry 47-6, at 7; Odetta Todd Aff., at ¶ 72.)

Mr. Makowski responded two days later, regretting that he did not respond to Ms. Todd's initial

inquiry (sent seven months earlier on November 22, 1999), and provided Ms. Todd with a copy

of Mr. Caprio's reply to Attorney Johnson.  In his letter dated July 27, 2000, Mr. Caprio asserted

that C & Y Services had determined that Ms. Todd was ineligible for kinship foster care

payments, explaining:

> Ms.  Todd was very difficult to reach and failed to complete the application
> process by not signing releases for Luzerne County Children and Youth Services
> to do background checks.  Ms. Odetta Todd reported arrests for welfare fraud,
> simple assault and previous drug and alcohol involvement.  Luzerne County
> Children and Youth Services requested to clarify this history, but she refused.
> She also refused to comply with all the requirements for a home study as
> required by the Department of Public Welfare.  Ms. Odetta Todd was enrolled in
> the mandatory foster care training sessions, however, she failed to actively
> participate and, at times, fell asleep during the sessions.  Due to Ms. Todd's own
> reluctance and behavior, she is not eligible for kinship care.

(Pl.'s Ex. 28, Dkt. Entry 47-6, at 13-14.)[8]  Mr. Caprio concluded in expressing his willingness to

---

[8]Mr. Caprio also outlined the assistance Ms. Todd was receiving:

assist Ms. Todd in pursuing adoption of her sister's children.[9]

According to Ms. Todd, this was the first notice she received that she had not fully complied with the foster parent training and home study requirements.  Nowhere in Mr. Caprio's letter to Ms. Todd's lawyer is a right to appeal mentioned, nor do Defendants claim that they informed Ms. Todd of her right to appeal.  Nor does Mr. Caprio indicate means by which Ms. Todd could rectify the problems he reported.

In August of 2000, Ms. Todd conferred with the American Civil Liberties Union in connection with what she perceived to be an invasion of her privacy attributable to Ms. Sullivan's contact with her probation officer and Court Advocate.  (Dkt. Entry 47-6 at 15-16.)  An

---

The Department of Public welfare reported that Ms. Odetta Todd's status at Welfare is "Disqualified Fraud" due to charges of welfare fraud.  She is currently receiving cash assistance for the children.  Ms. Todd's son, Lance, receives two hundred and five ($205.00) dollars per month and fifty ($50.00) dollars in child support.  Dione, Tesha and Vincent Todd receive four hundred and three ($403.00) dollars per month in cash assistance.  All the children receive two hundred thirty-eight ($238.00) dollars in Food Stamps.  Ms. Todd and the children are currently on Medical Assistance.

. . . .

Ms. Odetta Todd was provided with three hundred and thirty-six ($336.00) dollars in June of 1999 for rent assistance.  Ms. Todd is currently residing in subsidized housing.

(Pl.'s Ex. 28, Dkt. Entry 47-6, at 13-14.)

[9]Ms. Todd did not want to adopt in order to afford her sister the opportunity to take back the children.  Defendants have suggested that Ms. Todd did not want to go though the kinship foster care process because, if successful, legal custody of her sister's children would have been assumed by C & Y Services.

ACLU "Civil Liberties Complaint Form," which Ms. Todd claims was completed by an ACLU representative, asserted that Ms. Sullivan had obtained confidential information about Ms. Todd without her consent. (Id.) In the complaint form prepared by Gregory Malia, Ms. Todd acknowledged receiving the release forms and admitted to not signing them to date. (Id.) Ms. Todd, in her deposition, explained that Mr. Malia drafted the complaint after her discussion with him, and misrepresented what she said. (Odetta Todd Dep., Dkt. Entry 44-8, at 77.)

On November 3, 2000, a hearing was conducted by Judge Muroski at the request of C & Y Services to determine whether to discontinue the dependency of Tama Todd's children and allow them to remain with Plaintiff. (Dkt. Entry 44-9 at 4.) During the course of the hearing Plaintiff informed Judge Muroski that she had been denied kinship foster parent status, stating that she wanted to "find out how come I wasn't able to appeal Children and Youth's decision on why I couldn't become a foster parent to my niece and nephew." (Id. at 6.) Ms. Judith Omerza (then known as Judith Georgetti) explained that Plaintiff "started the process and didn't successfully complete that." (Id.) Concluding that the matter of kinship foster care status was not properly before him, Judge Muroski granted the request of C & Y Services to discontinue the dependency status of Tamu Todd's children.[10] (Id. at 9.)

---

[10] As to the kinship foster care issue, Judge Muroski stated:

The kinship program, you can appeal that. You can get into the administrative process with that, but as far as this is concerned there's no reason for the dependency to continue. You're a family member and you're taking good care of

Plaintiff subsequently wrote to Mr. Caprio, requesting "formal notice that I was denied becoming a kinship Parent."[11]  (Dkt. Entry 44-9 at 28.)  Plaintiff asserted that she was "entitled to appeal the decision and cannot without appropriate notice according to the Public Welfare Pennsylvania Code Title 55."  This request evidentially was not answered.

On April 28, 2001, Tamu Todd gave birth to a fourth child, named Amanda Barberio.  On October 21, 2002, legal and physical custody of Amanda was transferred to Ms. Todd.

It is the position of C & Y Services that Plaintiff was never "denied" kinship foster care status.  Ms. Sullivan testified that she considered Plaintiff to have withdrawn her application when she failed to execute the release forms accompanying Ms. Sullivan's letter of January 21, 2000.  (Sullivan Dep., Dkt. Entry 44-3, at 20.)  Ms. Klimek testified that Plaintiff's application was not denied.  Instead, it was considered incomplete because, without obtaining information from the probation office, Court Advocate, and Department of Public Welfare, she could not complete the home study.  (Klimek Dep., Dkt. Entry 44-5, at 36.)  Mr. Caprio testified that Plaintiff's application was incomplete because she had not signed the release forms.  (Caprio Dep., Dkt. Entry 44-2, at 10.)

In a letter to Mrs. Sullivan dated September 1, 2003, Ms. Todd wrote:

------------------------------

the children.  There's no need for a dependency.

Id.

[11]Ms. Todd's letter is dated November 29, 1999.  She testified that the wrong year was typed, and that the letter was written in November of 2000.  (Todd Dep., Dkt. Entry 44-8, at 18.)

In your letter, Ms. O'Kane and Ms. Black, you asked me to contact Luzerne County Children and Youth Services when my sister Tamu Todd is released from Luzerne County Prison and if I need direction in obtaining custody of my niece Amanda Lee Barberio.

I am notifying you that my sister Tamu Todd has been released from prison and I am going to need direction in obtaining custody of my niece Amanda Lee Barberio.

Again, your letter offered my family the option of having the Todd case reopened, and again I request Luzerne County Children & Youth Foster Care Department to "please advise me on what I need to do in order to complete the Kinship Foster Care Process. I am still willing to comply with whatever is required of me.

(Dkt. Entry 44-3 at 52.)

A meeting was held on November 25, 2003, to again address the matter of kinship foster care. Although the record is unclear, it appears from Mrs. Todd's notes of the meeting that she elected not to pursue the matter when informed that C & Y Services would not go back to her November 15, 1999 application. (Dkt. Entry 44-9 at 50.)

Ms. Todd brought this civil rights action on December 6, 2004. Following discovery, Defendants moved for summary judgment. The motion has been briefed and is ripe for decision.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B. Procedural Due Process Claim

The Fourteenth Amendment of the Constitution forbids a state from depriving persons of

14

"life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. XIV, § 1.  "For

more than a century the central meaning of procedural due process has been clear: 'Parties

whose rights are to be affected are entitled to be heard; and in order that they may enjoy that

right they must first be notified.'"  Fuentes v. Shevin,  407 U.S. 67, 80-81 (1972).  "It is equally

fundamental that the right to notice and an opportunity to be heard 'must be granted at a

meaningful time and in a meaningful manner.'"  Id. (citing Armstrong v. Manzo, 380 U.S. 545,

552 (1965)).  The United States Supreme Court has described this constitutional right to notice

and an opportunity to be heard in the following manner:

> The requirement of notice and an opportunity to be heard raises no impenetrable
> barrier to the taking of a person's possessions. But the fair process of decision
> making that it guarantees works, by itself, to protect against arbitrary deprivation
> of property. For when a person has an opportunity to speak up in his own
> defense, and when the State must listen to what he has to say, substantively
> unfair and simply mistaken deprivations of property interests can be prevented. It
> has long been recognized that 'fairness can rarely be obtained by secret,
> one-sided determination of facts decisive of rights. . . . (And n)o better instrument
> has been devised for arriving at truth than to give a person in jeopardy of serious
> loss notice of the case against him and opportunity to meet it.' Joint Anti-Fascist
> Refugee Committee v. McGrath, 341 U.S. 123, 170-172, 71 S.Ct. 624, 647, 95
> L.Ed. 817 Frankfurter, J., concurring).

Id. at 81.

When a plaintiff files suit under 42 U.S.C. § 1983 for a state actor's failure to provide

procedural due process, the familiar two-stage analysis is employed: (1) whether the asserted

individual interests are encompassed within the fourteenth amendment's protection of "life,

liberty, or property"; and if protected interests are implicated, (2) whether the procedures

15

available provided the plaintiff with "due process of law." Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir.1984).  Defendants do not contest that a property interest protected by the procedural component of the due process clause is at stake here.  Thus, the only question for this Court is whether "due process of law" was provided.

In this regard, "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." Id. (citing McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995)).

The administrative process at issue here contemplates the issuance of a written notice of any decision "to approve, disapprove or provisionally approve the foster family." 55 Pa Code § 3700.72(a).  Foster parents may appeal an adverse decision. 55 Pa Code §3700.72(b).  The Foster Family Care Agency ("FFCA") is to determine whether there are steps that can be taken to resolve the appeal without a hearing. 55 Pa. Code § 3700.72(c).  If the FFCA is unable to resolve the matter, the appeal is to be forwarded to the Office of Hearings and Appeals of the Pennsylvania Department of Public Welfare. Id.

Defendants contend that the review process set forth in 55 Pa. Code § 3700.72 was not triggered here because Ms. Todd never perfected her application.  According to Defendants,

16

Ms. Todd effectively abandoned her application by refusing to sign the release forms, falling asleep in foster care training sessions, and failing the home study.

Plaintiff, on the other hand, claims that she would have signed the release forms if given another chance to do so, and that she would have cured any other deficiencies in her application.  She complains that she was never given the opportunity to do so.

There is evidence to support each party's contention.  On the one hand, there is evidence that Plaintiff knew that her failure to execute the release forms would halt the processing of her application.  A rational fact-finder could conclude that her refusal to execute the release forms signaled her abandonment of the matter.  On the other hand, there is evidence that C & Y Services continued to process the application after she refused to execute the release forms.[12]  Moreover, the letter Atty. Johnson wrote in June of 2000 is inconsistent with a withdrawal of the application.  Mr. Caprio's reply to that letter did not indicate a willingness to accept release forms at that time.  Mr. Caprio declared Plaintiff ineligible for kinship foster parent status.  A rational fact-finder could conclude that Ms. Todd's application had been disapproved without an opportunity for the appellate review mandated by regulation.[13]

_____

[12] This case is unlike Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000), on which Defendants rely.  In contrast to the plaintiff in Alvin, who failed to initiate a grievance process in accordance with applicable rules, Ms. Todd did file an appropriate application for foster care status.  It is what happened after she submitted the application that fuels this dispute.

[13] The parties expend considerable time arguing whether Plaintiff had completed the application "process."  That dispute is collateral to the main issue: whether Plaintiff was accorded due process.  There is no dispute that Plaintiff filed an application for kinship foster

There is, therefore, a genuine dispute of fact bearing on the procedural due process issue.  If Ms. Todd abandoned the application, then no additional process was due.  But if she did not abandon the process, and the agency effectively denied her application, then she was not accorded due process.  Accordingly, Defendants' motion for summary judgment on the procedural due process claim will be denied.[14]

## C.  Substantive Due Process Claim

"[I]t is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure." Planned Parenthood of S.E. Pa

_____

care status.  It would seem only fair that, if an application was deemed incomplete, a claimant would be told that and given an opportunity to cure the problem.  If the claimant did not resolve the matter, then it would seem that the appropriate course of action would be the issuance of a formal denial of the application, with the right to appeal the question of whether the claimant's application was, in fact, deficient.  Otherwise, an agency could simply determine that an application is incomplete by imposing inappropriate requirements and, *de facto*, deny the application by not taking any action.  A claimant in such a scenario would be left without any recourse.  Viewed in this context, the dispute over whether Ms. Todd fell asleep in a training session goes to the substantive question of whether she should have been accorded kinship foster care payments.  It has nothing to do with whether she was given a meaningful opportunity to be heard on whether she completed the training process satisfactorily.

[14]It bears emphasizing that even if Ms. Todd proves a denial of procedural due process, it does not follow that damages would include foster care payments.  Proving a denial of procedural due process is not tantamount to proving an entitlement to the underlying benefits. See Carey v. Piphus, 435 U.S. 247, 260 (1978).  The failure to provide appropriate process does not mean that the claimant would have prevailed had the process been provided.  See Mays v. Scranton City Police Dept., 503 F.Supp. 1255, 1263 (M.D. Pa. 1980).  Of course, where the denial of a property interest is justified, but procedures are deficient, a plaintiff may recover damages for the mental distress caused by the absence of appropriate process. Carey, 453 U.S. at 263.  Gomes v. Wood, 451 F.3d 1122, 1131 (10th Cir.), cert. denied, 127 S. Ct. 676 (2006).

v. Casey, 505 U.S. 833, 846-47 (1992).  "The substantive component of the Due Process

Clause limits what government may do regardless of the fairness of procedures that it employs,

and covers government conduct in both legislative and executive capacities."  Boyanowski v.

Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000).  Substantive due process "'is

an area of law 'famous for controversy, and not known for its simplicity.'"  Nicholas v. Pa. State

Univ., 227 F.3d 133, 139 (3d Cir. 2000) (citing DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d

592, 598 (3d. Cir. 1995)) (internal citations omitted).

Defendants argue that Plaintiff's right to receive foster care payments does not implicate

a fundamental right protected by the Constitution.  (Defs.' Br. Supp. Mot. Summ. J., Dkt. Entry

43, at 19-20.)  Plaintiff responds that "to deny her statutorily mandated payments while acting

'in loco parentis' severely impedes her ability to manage and care for the children."  (Pl. Br.

Opp'n Mot. Summ. J., at 8.)

"To prevail on a non-legislative substantive due process claim, 'a plaintiff must establish

as a threshold matter that he has a protected property interest to which the Fourteenth

Amendment's due process protection applies.'"  Nicholas, 227 F.3d at 140 (citing Woodwind

Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000)).  In this regard, "'not all property

interests worthy of procedural due process protection are protected by the concept of

substantive due process.'"  Nicholas, 227 F.3d at 140 (quoting Reich v. Beharry, 883 F.2d 239,

244 (3d Cir. 1989)).  Whether a certain property interest falls within the ambit of substantive

due process "depends on whether the interest is 'fundamental' under the United States Constitution." Id. "'Each new claim to [substantive due process] protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed.'" Id. (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229-30 (1985)).

Entitlement to Kinship Foster Care maintenance is simply not a fundamental interest "'implicit in the concept of ordered liberty like personal choice in matters of marriage and family.'" Nicholas, 227 F.3d at 142 (citing Homar v. Gilbert, 63 F. Supp. 2d 559, 576 (M.D. Pa. 1999) (internal citations omitted). Nor does it bear resemblance to other rights and real property interests that have been deemed fundamental under the Constitution. An interest in Kinship Foster Care payments is more closely analogous to those interests that fail to rise to the level of a fundamental interest protected by substantive due process, such as welfare benefits. It is well-settled that "[w]elfare benefits are not a fundamental right, and neither the State or Federal Government is under any sort of constitutional obligation to guarantee minimum levels of support." Lavine v. Milne, 424 U.S. 577, 584 n.9 (1976). "[T]he due process clause confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests which the government itself may not deny." Hassan v. Bradley, 818 F. Supp. 1174, 1179 (N.D. Ill. 1993), aff'd, 45 F.3d 1053 (7th Cir. 1995). Accordingly, Defendants will be granted summary judgment on Plaintiff's substantive due

process claim.[15]

D.  Equal Protection Claim

The Fourteenth Amendment of the Constitution provides, in pertinent part, that "[n]o

State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.

CONST. amend. XIV, § 1.  The Court of Appeals for the Third Circuit has observed that the

equal protection clause "is not a command that all persons be treated alike but, rather, 'a

direction that all persons similarly situated should be treated alike.'" Artway v. Attorney Gen.,

81 F.3d 1235, 1267 (3d Cir. 1996); see also Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d

676, 677 n.1 (3d Cir. 1980) ("An equal protection claim arises when an individual contends that

he or she is receiving different treatment from that received by other individuals similarly

situated.").

"The level of scrutiny applied to ensure that classifications comply with this guarantee

differs depending on the nature of the classification. Classifications involving suspect or

quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to

heightened scrutiny." Artway, 81 F.3d at 1267.  "Other classifications, however, need only be

rationally related to a legitimate government goal." Id.

_____

[15]Plaintiff, relying on Maine v. Thiboutot, 448 U.S. 1 (1980), argues that she has a
substantive right to foster care payments under federal law that she may enforce in a § 1983
action.  Defendants did not address this argument.  Accordingly, whether Plaintiff may maintain
a civil rights action to recover foster care payments cannot be decided at this point in time.

In this case, there is a lack of evidence that Plaintiff was treated differently than other similarly situated persons applying for foster care.  Accordingly, Defendants are entitled to summary judgment on the equal protection claim.

E.  Pennsylvania Constitutional Law Claims

The Pennsylvania Supreme Court has held that "the equal protection provisions of the Pennsylvania Constitution are analyzed . . . under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution." McCusker v. Workers' Comp. Appeal Bd., 639 A.2d 776, 777 (Pa. 1994) (quoting Love v. Borough of Stroudsburg, 597 A.2d 1137, 1139 (Pa. 1991)).  With regard to due process, although not bound by the decisions of the United States Supreme Court, the Pennsylvania Supreme Court has "held that the requirements of Article I, Section I of the Pennsylvania Constitution are not distinguishable from those of the 14th Amendment," thus "the same analysis [applies] to both claims." Pa. Game Com'n v. Marich, 666 A.2d 253, 255 (Pa. 1995) (citing R. v. Com. of Pa., Dep't of Pub. Welfare, 636 A.2d 142, 152-153 (Pa. 1993).  Accordingly, the outcome of Plaintiff's claims under the Constitution of Pennsylvania will mirror that of her claims under the Constitution of the United States.

III. CONCLUSION

For the reasons stated in the foregoing memorandum, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's substantive due process and equal protections claims,

but denied as to Plaintiff's procedural due process claim.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ODETTA A. TODD,                              :
                    Plaintiff                :
        v.                                   :          3:CV-04-2637
                                             :          (JUDGE VANASKIE)
LUZERNE COUNTY CHILDREN AND                  :
YOUTH SERVICES, EUGENE N. CAPRIO,            :
                    Defendants               :

ORDER

_____NOW, THIS 28th DAY OF MARCH, 2008, for the reasons set forth in the forgoing

memorandum, IT IS HEREBY ORDERED THAT:

        1.   Defendants' Motion for Summary Judgment (Dkt. Entry 41) is GRANTED as to

Plaintiff's substantive due process claim regarding a property interest in kinship foster care

maintenance and Plaintiff's equal protection claim under the Pennsylvania and United States

Constitutions.

        2.   Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's procedural

due process claim under the Pennsylvania and United States Constitutions, and DENIED  as to

Plaintiff's section 1983 claim for wrongful denial of foster care payments.

        3.   A telephonic scheduling conference shall be held on April 24, 2008, at 1:30 p.m.

Counsel for Plaintiff is responsible placing the call to (570) 207-5720 and all parties should be

ready to proceed before the undersigned is contacted.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge